**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**5:17-cv-194-FDW**

| | | |
|---|---|---|
| **GREGORY D. TILLERY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **MARTA KALINSKI, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** comes before the Court on Defendant's Motion for Summary Judgment, (Doc. No. 24).

## I.    BACKGROUND

*Pro se* incarcerated Plaintiff's Complaint passed initial review on a claim of deliberate indifference to a serious medical need against Dr. Marta Kalinski for incidents that allegedly occurred at the Alexander Correctional Institution.[1]

**(1)    Complaint** (Doc. No. 1)

Plaintiff suffers from sickle cell disease. He went through a sickle cell crisis at the end of February/ beginning of March 2016. During the beginning and middle of March 2016, Plaintiff's condition became so bad that he could not walk because of severe pain and he declared a medical emergency. Dr. Kalinski came to Plaintiff's cell and told him that nothing was wrong with him and provided no treatment. Plaintiff declared numerous medical emergencies but was still given no medical attention for his pain.

---

[1] Plaintiff's address of record is at the Maury C.I. However, the NCDPS website indicates that he is presently housed at Neuse C.I. See https://www.ncdps.gov/dps-services/crime-data/offender-search. A copy of this Order will be mailed to Plaintiff at both addresses in an abundance of caution. Plaintiff is reminded that it is his responsibility to keep the Court apprised of his current address at all times.

After complaining for several weeks, Plaintiff was finally called to medical for law work where they discovered that something was "really wrong" and had him rushed to the hospital where he received a blood transfusion. (Doc. No. 1 at 5). A doctor discovered that Plaintiff had internal bleeding and said that Plaintiff could have died if he did not go to the hospital when he did. The bleeding was caused by the prison's denial of medical attention for his disease and problems with staff. Dr. Kalinski refused to refill Plaintiff's prescription when he ran out of medicine. She did not schedule a meeting with Plaintiff and he went without his medication for a month.

Plaintiff seeks declaratory judgment, injunctive relief, compensatory and punitive damages, the costs of this suit, any other relief the Court deems just, proper, and equitable, and a jury trial.

**(2)** **Defendant's Motion for Summary Judgment** (Doc. No. 24)

Defendant Kalinski argues that she was not deliberately indifferent to Plaintiff's serious medical needs, that she is entitled to qualified immunity, that Plaintiff cannot obtain injunctive relief, that Plaintiff's claim for monetary relief is barred by the Eleventh Amendment, and that Plaintiff is not entitled to punitive damages.

**(3)** **Plaintiff's Response**

Plaintiff was informed of the importance of responding to Defendants' motion as well as the legal standard applicable to summary judgment motions. See (Doc. No. 27). However, he failed to respond to Defendant's Motion for Summary Judgment.

**(4)** **Evidence**[2]

**Affidavit of Marta Kalinski, M.D.** (Doc. No. 26)

Licensed physician Marta Kalinski bases the affidavit on her personal knowledge and/or

---

[2] This section is not exhaustive.

review of Plaintiff's medical records while Plaintiff was at Alexander C.I. from February 29, 2016 through November 1, 2016 when he was transferred to Marion C.I. Plaintiff had no involvement with Plaintiff while he was incarcerated at any facility other than Alexander and did not render any treatment to him between November 1, 2016 and October 26, 2017.

Contrary to Plaintiff's assertions, Defendant Kalinski provided care to Plaintiff on each and every occasion he was referred to her for treatment between February 29, 2016 and November 1, 2016, and on each and every occasion when his chart was referred to Kalinski and/or she reviewed it during that time period. She did not ignore Plaintiff's medical needs or deny him any necessary treatment for any alleged medical condition.

In NCDPS, to obtain an appointment in the medical clinic without a regularly scheduled follow-up appointment, an inmate first submits a Sick Call Appointment Request with his complaints, which is then reviewed by a triage nurse who reviews the complaints and schedules a time for the Sick Call Appointment with a nurse. At the Sick Call Appointment, the nurse assesses the inmate and records his complaints, as well as the nurse's observations, assessments, and plan. The nurse determines at the appointment whether the inmate is to be seen by another healthcare provided and makes such referrals if necessary. An inmate is not scheduled for an appointment with a physician unless he is referred by the nurse, nor is the inmate's chart submitted for review unless the nurse submits it for review. An inmate is not seen by a physician unless an appointment is scheduled by a nurse and the inmate presents for the appointment. When an inmate's chart is referred to a provider for review, a specific issue is referred to the provider to review the chart and usually only that issue is considered by the provider. Kalinski has not been involved in the creation or revisions to the NCDPS Sick Call Policy and she is not responsible for the placement of inmates on the Sick Call Appointment list, for referral of inmate charts to health care providers for chart

reviews, or for ensuring that inmates are scheduled for appointments with health care providers.

Sickle cell disease is an inherited red blood cell disorder. On certain occasions, the red blood cells of a patient with sickle cell disease become hard, sticky, and irregularly shaped like crescent moons and are referred to as sickled. Sickle cell disorder is known to have occasional sudden onset of severe sickle cell crisis causing a sudden, drastic drop in hemoglobin. A sudden onset of sickle cell crisis may not present with easily identifiable or noticeable symptoms. During a sickle cell crisis, the red blood cells become dehydrated and a sickled shape of the cells occurs. Due to their inflexibility and irregular shape, the sickled cells may partially block small blood vessels and arteries which can cause pain in the back, knees, arms, legs or stomach, and infection. The sickled cells increase blood thickness and are unable to carry the same amount of oxygen, which can slow oxygen delivery. Sickle cell crises usually come on suddenly and can last from hours to weeks depending on the patient. While the exact cause of a sickle cell crisis is unknown, crises may occur with the onset of dehydration, stress, illness, and change in temperature, among others. A sickle cell crisis "does not necessarily require treatment by a health care provider." (Doc. No. 26 at 4). Patients can usually treat symptoms by "significantly increasing their fluid intake and taking over-the-counter pain medication, such as non-steroidal anti-inflammatory medication, including ibuprofen, and/or acetaminophen, to treat any resultant pain." (Doc. No. 26 at 4). Significantly increasing fluid intake can resolve a sickle cell crisis. (Doc. No. 26 at 4). If the pain cannot be managed with over-the-counter pain medications, stronger prescription medications prescribed by a health care provider may be needed until the pain is under control. In some circumstances, intravenous fluid may be administered and in very rare circumstances, a blood transfusion may be required.

Plaintiff underwent a health screening upon his arrival at Alexander on January 13, 2016.

He expressed a family history of sickle cell trait and, upon information and belief, he had been diagnosed with sickle cell disease. He did not report any sickle cell disease exacerbations at intake. The nurse noted that no new health issues were identified as a result of the health screening and Plaintiff was screened for housing in the general population.

On January 28, 2016 at 8:05 PM, Plaintiff was seen by a nurse in response to an inmate self-declared emergency ("EMI"), during which he complained of pain in his left leg, back, and ribs. The nurse took his vital signs, which were stable, and noted he had no signs or symptoms of dehydration, did not have a fever, and did not exhibit hypo-oxygenation (shortness of breath). Plaintiff informed the nurse that he was drinking eight to 10 glasses of water a day. Plaintiff appeared to be in pain so, pursuant to NCDPS nursing protocol, the nurse entered an order for Plaintiff to take 10 mg of Ketorolac (Toradol – a non-steroidal anti-inflammatory medication) every eight hours as needed for two days and provided him a dose at that time. The nurse noted that Plaintiff would be placed on the schedule to see a provider due to his sickle cell disease.

On January 29, 2019 at 9:52 AM, Plaintiff was seen by another nurse in response to an EMI during which he complained of continued pain, mainly to his legs. The nurse noted that he did not complain of abdominal pain. Plaintiff's vital signs were stable and the nurse noted that Plaintiff had an appointment with a physician later that morning, and advised him to return to the clinic if his pain increased.

Plaintiff was seen by another nurse in response to an EMI at 6:40 PM that day, at which point he complained of pain in his lower back, chest, and left hip and from a sickle-cell disease flare-up. Plaintiff informed the nurse that the medication he received on January 28 managed his pain for about an hour but then returned. The nurse noted that Plaintiff had been taking Toradol and that Plaintiff had been scheduled to see a physician earlier that day but was unable to be seen.

Kalinski does not know why Plaintiff was unable to be seen but it was not for any reason related to Kalinski, and she did not refuse to see Plaintiff. Often, inmates do not attend scheduled appointments during the medical clinic hours, then declare EMIs after the clinic has closed and the regular medical staff leaves so that an on-call provider will call in treatment without familiarity with the inmate's full history, possibly including transport to the local emergency department where inmates are more likely to receive narcotic agents. The nurse noted that Plaintiff appeared to be in pain. The nurse notified Kalinski of Plaintiff's complaint that the medication was not effective and, based on the information provided by the nurse, Kalinski instructed the nurse to encourage Plaintiff to drink more fluids. In addition to relaying Kalinski's instructions, the nurse entered an order for Plaintiff to take two 325 mg tablets of Acetaminophen three times a day as needed for five days in addition to the Torodol pursuant to the non-urgent back pain protocol. Plaintiff was advised to return to the medical clinic if his condition worsened.

At 10:33 PM, the same nurse conducted a follow-up review of Plaintiff's chart. She noted that his prescription for Toradol was due to expire on January 30, 2016. The nurse contacted the on-call provider who gave an order for Plaintiff to continue taking 10 mg of Toradol every eight hours as needed until he could be seen by a provider the next week on or about February 2, 2016.

On January 30, 2016 a nurse responded to a January 19, 2016 Sick Call Appointment Request at which time Plaintiff complained of problems with his spine. The nurse noted that he was seen on January 29 and was scheduled for an appointment with a provider on February 2, 2016 and, as a result, took no further action.

On February 1, 2016, Plaintiff was seen by Dr. Jones in connection with the nurse's referral from the January 29 EMIs. Plaintiff informed Dr. Jones that he had a sharp pain in both sides of his chest, left thigh, and left back which began five days ago. He denied any fever, gastrointestinal

symptoms, shortness of breath, or urologic symptoms. Plaintiff reported he had increased his fluid intake and was taking Torodol, which was not effective in controlling his pain. Dr. Jones assessed Plaintiff with a sickle cell crisis and ordered 50 mg of Ultram (Tramadol – narcotic pain reliever) every six hours for five days. Dr. Jones also entered an order for Plaintiff to wear thermal underwear for one year to prevent hypothermia-induced sickle cell disease crisis.

On February 5, 2016, Plaintiff was scheduled for a provider appointment in relation to his January 29, 2016 EMIs and his January 19, 2016 Sick Call Appointment Request. At 11:08 AM that morning, it was noted that Plaintiff did not present for his scheduled appointment. The nurse's note pertaining to Plaintiff's failure to attend was referred to Kalinski, who was not aware that Plaintiff had been seen by Dr. Jones on February 1, and ordered that Plaintiff be brought to the clinic to be evaluated. About an hour later, Plaintiff was brought to the clinic and Kalinski examined him. Plaintiff expressed confusion about his examination in light of his visit with Dr. Jones, and Kalinski explained that she wanted to assess his sickle cell disease. Plaintiff reported pain in his muscles and joints over the past few days and that Dr. Jones ordered Tramadol on February 2 for pain. Plaintiff reported maintaining high water intake but continued pain. He also complained of back pain. Kalinski reviewed his chart and noted that a spine x-ray had been done on January 5, 2016, that showed spine and spleen findings common in sickle cell patients. Kalinski explained these findings to Plaintiff and took his vital signs, which were stable. Upon examining Plaintiff, Kalinski found that he had tenderness along his spine and left lower extremity. Kalinski assessed Plaintiff with sickle cell crisis and chronic pain syndrome and entered orders for: (1) 500 vitamin C with iron every day for a year; (2) 325 mg of iron twice a day for a year; (3) entry of a UR Request for 50 mg of Tramadol for pain three times a day as needed for a year;[3] (4) 5/325 mg

---

[3] No UR request was required for Dr. Jones' prior short-term Tramadol order.

of Oxycodone/APAP (Percocet – narcotic pain reliever) four times a day as needed for acute sickle cell crisis pain; and (5) obtain a basic metabolic profile, complete blood count, and urinalysis. Kalinski also instructed that Plaintiff be assigned to a lower bunk due to his back pain. Kalinski informed Plaintiff that, although she was entering an order for Percocet for the next few days, his pain management going forward would mainly be in the form of Tramadol once that medication had been approved.

On February 18, 2016, Plaintiff was seen by a travel nurse that was recorded as a Sick Call encounter but, upon information and belief, appears to have been in response to an EMI during which Plaintiff informed the nurse of right elbow pain extending to his shoulder. Plaintiff reported to the nurse that he had sickle cell disease and his sickle cell crisis resolved the prior week. The nurse took Plaintiff's vital signs, which were stable. The nurse assessed Plaintiff with impaired comfort and provided him with analgesic balm pursuant to Plaintiff's request.

On March 3, 2016 at 12:50 AM, Plaintiff was seen by a nurse pursuant to an EMI during which Plaintiff complained of pain in his back, legs, and chest and speculated that he was in sickle cell crisis. The nurse assessed Plaintiff in his cell because he said he was in too much pain to go to the clinic. The nurse observed Plaintiff lying in his cell on his stomach yelling, kicking, and complaining of severe pain. The nurse took his vital signs, which were stable. The nurse tried to explain to Plaintiff that she would have to contact the on-call provider but Plaintiff got mad and told the nurse she was not listening to him. The nurse again tried to explain to Plaintiff that she would not be able to do anything for him until she called the on-call provider. She noted that Plaintiff was already taking Oxycodone and contacted the on-call physician, Dr. Uhren, who ordered that Plaintiff take 650 mg of Tylenol Arthritis three times a day until he could be seen by a provider the following day. Dr. Uhren instructed the nurse that, if Plaintiff's symptoms continued

to worsen he could be sent to the local emergency room for further evaluation and treatment since he could not be seen by a provider as it was after hours. Less than an hour later, at 1:20 AM, the nurse noted that Plaintiff continued to complain of severe pain and claimed to have taken 10 packages of Tylenol but it was not effective in treating his pain. The nurse decided to send Plaintiff to the emergency room for evaluation and treatment.

At the emergency room, Plaintiff was seen by emergency medicine physician Dr. Sullivan. Plaintiff complained of pain and informed Dr. Sullivan that he had sickle cell disease. He reported taking Tylenol and drinking a lot of water but the pain continued to worsen. Dr. Sullivan ordered laboratory tests and an EKG. Plaintiff's hemoglobin, hematocrit, and potassium were low, which is to be expected due to sickle cell disease, and the EKG was normal. Dr. Sullivan assessed Plaintiff with sickle cell crisis and low potassium. Plaintiff was given several liters of fluids and Dilaudid, Benadryl, and Toradol. Dr. Sullivan noted that Plaintiff did not appear to be uncomfortable anymore. Plaintiff was provided with oral potassium repletion and instructed on potassium rich foods and was instructed to increase his fluid intake. Plaintiff was discharged and was recommended to follow up with NCDPS providers in one to three days. No recommendations were made for pain medication.

At 6:56 AM, Plaintiff returned to Alexander where a nurse took his vital signs, which were stable. Plaintiff complained that he was cold and still in pain despite having been given numerous pain medications at the ER. The nurse noted that Plaintiff would be scheduled for a follow up examination and placed him in the provider clinic for follow-up examination by Kalinski.

Kalinski attempted to personally evaluate Plaintiff at 9:06 AM that morning. However, Plaintiff had left the receiving area and went back to his cell. Kalinski conducted a chart review, noting Plaintiff's recent return from the ER where he received IV fluids and a high dose of narcotic

agents. Upon review of the nurse's note from his readmission to Alexander, Kalinski determined that he did not need any additional narcotic agents to control his pain as his vital signs were stable, had been provided IV fluid, encouraged to increase his fluid intake, and had been provided a high dose of narcotics at the hospital. During her review, Kalinski also noted that Plaintiff often presented to the medical clinic with complaints of a high degree of pain, but that his physical examination findings and vital signs contradicted his reported complaints/symptoms and did not confirm sickle cell disease exacerbation. For this reason, Kalinski determined that Plaintiff "should be closely monitored for narcotic agent use and overuse." (Doc. No. 26 at 13).

At 5:59 PM that same day, Kalinski was called to evaluate Plaintiff for complaints of pain. Kalinski went to Plaintiff's cell to personally evaluate him. Upon arrival, Kalinski found that Plaintiff appeared comfortable and was without any sign of discomfort or stress. Plaintiff said he still had pain all over and needed IV pain medication that started with "D" because morphine was not strong enough for his pain. Plaintiff was not able to give any details about the sites or character of his pain. Plaintiff did not have any shortness of breath, a common symptom of sickle-cell crisis, and that his blood oxygenation was good. Kalinski checked his lungs, heart sounds, abdomen, and found he did not have a fever or show any signs of infection. Kalinski assessed Plaintiff with sickle cell disease, however "based on [her] examination and medical judgment, [she] did not believe that he was in crisis, as he did not present with any objective symptoms and he had just returned from an ER assessment where he was treated." (Doc. No. 26 at 13). Further, pursuant to Plaintiff's report, "he had already been prescribed pain medications both in the ER and he received pain medication provided by NCDPS." (Doc. No. 26 at 13-14). Kalinski's assessment was that Plaintiff's disease was "well controlled…." (Doc. No. 26 at 14). Kalinski instructed Plaintiff to follow up with a Sick Call Appointment Request as needed and Kalinski requested the ER

discharge instructions for her review.

On March 4, 2016, Plaintiff was seen by a nurse in response to an EMI during which he complained of arm and leg pain unrelieved by Tylenol. He attributed his pain to sickle cell disease. The nurse took his vital signs, which were stable. The nurse noted that Plaintiff had run out of the prescribed Percocet and that his prescription of Tylenol Arthritis by the on-call provider had expired that same day. The nurse informed Plaintiff he would need to take Tylenol or Ibuprofen to treat his pain since the Oxycodone prescription had not expired even though he had taken all 30 of the tablets prescribed to him, and that he should return to the clinic if his condition worsened. The nurse observed that after the encounter, Plaintiff walked himself back to his cell. The nurse did not refer Plaintiff or his chart to Kalinski or any other provider for review or treatment.

Two and a half hours later, Kalinski personally evaluated Plaintiff in response to a Code Blue. On the way to see Plaintiff, Kalinski was informed by a nurse who assessed Plaintiff that he had called a Code Blue because he felt that walking to medical would be too difficult due to his pain. Kalinski observed Plaintiff sitting up in bed and did not observe any signs of discomfort. His vital signs were normal and were not indicative of a patient in severe pain or in sickle cell crisis. Plaintiff informed Kalinski that he had pain all over and that only narcotics stronger than Dilaudid (an opioid pain reliever) controlled his pain. Plaintiff reported that he had not eaten anything for the past few days due to pain but, when Kalinski instructed a nurse to perform a blood glucose test, Plaintiff immediately said that he just had one small bite of food. The test revealed a glucose level of 136, which is normal and inconsistent with a patient who has not eaten for a few days or only had a small bite of food just before the test. Upon examination, Kalinski observed that Plaintiff did not have any muscle weakness and his joints were non-tender without any swelling. He did not have any abdominal swelling or signs of fever, priapsim or dyspnea. Had any of those

symptoms been present, they would have been indicative of a potential sickle cell crisis. Based on the examination, Kalinski determined that Plaintiff did not present with objective symptoms of a high degree of pain or physical findings indicative of a sickle cell crisis that would support prescription of opioid pain medication. Kalinski noted that Plaintiff's overall behavior was "questionable" and that his reported symptoms "were not reliable based on his objective physical finding." (Doc. No. 26 at 15). Kalinski explained to Plaintiff the elements of his inappropriate behavior, which included a medically unnecessary Code Blue. Kalinski encouraged Plaintiff to be more honest about his medical complaints and educated him about the risks of overuse of narcotic agents. She also explained that IV narcotics are not available at Alexander. She offered him non-narcotic analgesics for his complaints of persistent pain, but he still demanded narcotics and refused the offer of other pain medication. In spite of his refusal, Kalinski entered orders for: (1) one multivitamin every day; (2) one 650 mg tablet of Acetaminophen ER three times a day for 180 days; (3) and several items of lab work to help determine whether he is in sickle cell crisis.

On March 6, 2016, Plaintiff was seen by a nurse for follow up. Plaintiff informed the nurse that he had sickle cell disease, had been in pain since March 2, that his meals were being brought to him, and he was brought to medical via wheelchair. The nurse observed that Plaintiff did not have any shortness of breath, his respirations were even, and his lungs were clear. He reported that he had been eating the food brought to his cell but that his appetite was diminished. He said Tylenol was not effectively managing his pain and requested something stronger. The nurse noted that he was prescribed 30 pills of Oxycodone on February 18, 2016 and had used all 30 pills in 10 days. The nurse further noted that Plaintiff was seen by a provider on March 3 and 4, 2016 and that Kalinski was concerned that Plaintiff was opioid dependent. The nurse assessed Plaintiff with impaired comfort and encouraged him to push fluids, especially water. Plaintiff said he was already

doing so. The nurse indicated that Plaintiff was to be housed in the lower unit to eliminate his use of stairs and entered an order for 325 mg of Acetaminophen three times a day as needed for two days and informed him he was scheduled to see the provider the following morning.

On March 7, 2016, Plaintiff was evaluated by Dr. Jones. At that time, his vital signs were stable and looked unhappy but otherwise was showing no signs of acute distress. Plaintiff complained to Dr. Jones about his history of sickle cell disease and said he had pain in his back and extremities for five days. He said his appetite was poor and that he had been trying to drink extra fluids. Dr. Jones examined him and assessed him with chronic sickle cell disease but did not assess him as being in a sickle cell crisis. Dr. Jones decided to treat his pain with Tramadol rather than Percocet and entered an order discontinuing Percocet. He ordered the submission of a UR Request for two 50 mg tablets of Ultram every six hours as needed for pain for 90 days. Dr. Jones encouraged Plaintiff to continue pushing fluids.

Later that day, a nurse entered a note regarding Dr. Jones' order for Tramadol. The nurse noted that Plaintiff had been provided the Ultram prior to UR approval and that Kalinaki's order for Tramadol was still pending. The UR requested clarification, which Kalinski provided, explaining that Plaintiff would not continue on narcotic agents such as Percocet. On March 10, 2016, Dr. Jones' UR request for Tramadol was approved and Kalinski's February 9, 2016 UR request was withdrawn. The nurse contacted Central Pharmacy to clarify options and obtain the Tramadol locally but was informed that was not an option because the UR Request had not yet been approved. The nurse notified a provider (not Kalinski) of Central Pharmacy's response.

On March 8, 2016, Plaintiff was seen by a nurse in response to an EMI at which he complained about back and leg pain that he attributed to sickle cell disease. His vital signs were stable and noted that Plaintiff complained of foot, hip, joint, low and mid back pain, and muscle

aches. The nurse noted that Dr. Jones saw Plaintiff the prior day and told Plaintiff he needed to wait for his pain medications to be approved by UR. Neither Plaintiff nor his chart was submitted to Kalinski for review.

On March 10, 2016, the UR approved Dr. Jones' March 7 request for Tramadol. Later that day, two 50 mg tablets of Tramadol were administered to Plaintiff after he requested pain medication.

On March 16, 2016, a nurse noted that, although 110 tablets of Tramadol were received from the local pharmacy for Plaintiff, there was a problem with the UR request and therefore Tramadol was not being administered to Plaintiff. The nurse also noted that Plaintiff had been requesting medication for pain related to his sickle cell disease. Upon information and belief, the nurse informed Kalinski of the issue and Kalinski wrote an order for Plaintiff to take two tablets of Tramadol every six hours as needed, and Plaintiff was provided his medication that day.

On March 18, 2016 at 11:15 PM, a nurse received a call from Lab Corp reporting critical lab values from the CBC performed earlier that day. The nurse contacted the on-call physician, Dr. Lance, who ordered the nurse to send Plaintiff to the local ER. Plaintiff was transported to the ER early in the morning on March 19, 2016. Dr. Otterberg noted that Plaintiff presented with complaints of a sickle cell crisis lasting two weeks resulting in leg and back pain, he felt weak over the past few days, and had vomited that morning. Plaintiff's vital signs were stable and Plaintiff was in no apparent distress. The remainder of the examination was normal. Dr. Otterberg's differential diagnosis was sickle cell crises verses acute anemia and ordered: (1) IV saline; (2) IV of 30 gm of Tradol; (3) IV of 1 mg of Diaudid; (4) IV of 4 mg of Zofran (anti-nausea); (5) chest x-ray; (6) lab work including CBC. The lab results contained some elevated findings so Dr. Otterberg admitted Plaintiff to the hospital for further treatment and monitoring. Dr. Stephens (the

hospitalist) assessed Plaintiff with acute anemia, acute sickle cell crisis, and acute hypokalemia (low potassium) and decided to transfuse him with three units of blood, provide morphine for pain, and provide potassium. There was no finding of internal bleeding. Plaintiff was discharged from the hospital on March 21, 2016. Dr. Stephens noted that Plaintiff had improved significantly. Kalinski did not render any medical treatment while Plaintiff was in the hospital between March 19 and 21, 2016.

Dr. Stephens recommended that a CBC be performed four days after discharge and noted that his pain appeared well-controlled. Dr. Stephens ordered one 5/325 mg Percocet every eight hours (20 pills were dispensed), and continued folic acid, iron, and vitamin C supplements daily. Upon returning to Alexander, Plaintiff was screened by a nurse. Plaintiff's vital signs were stable and Plaintiff denied any pain. Upon information and belief, the nurse called Kalinski regarding Dr. Stephens' order for Percocet and Kalinski approved that the order be entered. The nurse referred Plaintiff to a provider for a follow-up examination and instructed that he should follow up with a Sick Call Appointment Request as needed.

On March 29, 2016, Plaintiff did not appear for his appointment in the chronic disease clinic for a follow up evaluation and blood work for diabetes and sickle cell.

On March 30, 2016, Plaintiff refused his appointment with Kalinski for an evaluation following his discharge from the hospital. The reason for the denial is not documented.

On April 5, 2016, due to Plaintiff's refusals, Kalinski conducted a review of Plaintiff's chart in follow up for lab orders, including his transfusion at the hospital and subsequent refusal of follow up. Kalinski renewed Plaitniff's order for 1 mg of folic acid for a year and entered orders for lab work.

Between April 6, 2016 and August 9, 2016, neither Plaintiff nor his chart was referred to

Kalinski and therefore she did not render him any care during that time. However, during that time, Plaintiff failed to appear for a Sick Call Appointment, was not receptive to any explanation of treatment when he did not appear, and refused blood work that NCDPS requires for the renewal of certain pain medication.

On August 10, 2016, Plaintiff was seen by a nurse in response to an EMI during which he complained of back and leg pain related to a sickle cell crisis. His vital signs were stable. The nurse noted that she saw Plaintiff ambulating with an officer without difficulty but, when he saw her, he bent over and started rubbing his back. Plaintiff told the nurse he was drinking plenty of water and had been taking Tylenol, but his pain persisted. Although Plaintiff reported severe pain, the nurse noted no significant findings that correlated with that claim. The nurse decided to call Kalinski, who was the on-call physician at that time. Kalinski ordered that Plaintiff receive a single 60 mg injection of Ketorolac for pain and informed him that he should be seen by a provider. Upon information and belief, the nurse administered the injection during the EMI encounter.

On August 11, 2016, Plaintiff was seen by a nurse in response to an EMI. He complained of pain in his right knee, shoulder, and lower back and said he was hydrating. He took Acetaminophen that morning but reported no relief from pain. He had been prescribed Tramodol but it had not arrived yet. His vital signs were stable. The nurse assessed Plaintiff with acute pain that may be associated with sickle cell so called Kalinski, who ordered blood work to exclude a sudden infection that may precipitate a sickle cell crisis. Kalinski subsequently reviewed the lab results and noted that several measures were low but improved and that other levels were elevated. Kalinski determined that the results of the lab work showed marked improvement, and therefore, Kalinski declined to enter any orders at that time.

Between August 12 and September 8, 2016, neither Plaintiff nor his chart were referred to

Kalinski so she did not render any care to him during that time. In that period, Plaintiff again failed to appear for ordered blood work.

Between September 10 and November 1, 2016, neither Plaintiff nor his chart were referred to Kalinski and therefore she did not render any care to him during this period.

On November 1, 2016, Plaintiff was transferred to Marion C.I. between November 1, 2016 and October 26, 2017, the date when Plaintiff signed his Complaint in the instant case, Plaintiff was not incarcerated at Alexander and Kalinski had no involvement in his care.

Between February 29, 2016 (the date on which the events alleged in the Complaint first occurred) and October 26, 2017 (the date when Plaintiff filed his Complaint), Kalinski assessed Plaintiff on at least two occasions and performed chart reviews of his medical records on at least two occasions. Plaintiff was examined by nurses for EMI evaluations on at least five occasions and was evaluated by, and provided treatment by, Dr. Jones and Dr. Byrd, including personal assessments and chart reviews.

Kalinski was familiar with Plaintiff and his sickle cell disease prior to the time period at issue as she had treated him at Alexander in January and February (prior to the 29th) 2016. During this time, Kalinski specifically treated him for a presumed exacerbation of his sickle cell disease (a sickle cell crisis) by prescribing high volume fluids, iron, Tramadol, and Percocet, which resulted in resolution of his sickle cell symptoms.

During the time period beginning February 29, 2016, Kalinski became concerned that Plaintiff was bringing up complaints of sickle cell disease to obtain opioids, because her objective observations and findings, as well as those of other health care providers, were often inconsistent with Plaintiff's subjective complaints. These observations, in conjunction with the value of pain medication on the black market within NCDPS, indicated to Kalinski that Plaintiff "should be

closely monitored for narcotic agent use and overuse." (Doc. No. 26 at 26). In addition, Plaintiff routinely failed to appear for scheduled appointments, but instead declared EMIs. Plaintiff failed to remain in medical for at least one assessment, and refused blood work on at least two occasions, and failed to appear for at least three sick call appointments and at least two appointments with Kalinski. Kalinski believed that Plaintiff should be treated but closely monitored.

In addition to Kalinski's two in-person treatments of Plaintiff, she responded to chart reviews and inquiries from other medical personnel, ordered Treamadol, approved and ordered Percocet, ordered an injection of Ketorolac, and ordered blood tests.

"At no time did [Kalinski] disregard the symptoms with which [Plaintiff] presented or which were referred to [Kalinski], but on the contrary, [Kalinski] took appropriate action and made professional decisions and treatment plans based on [her] training and experience, [her] medical judgment, [Plaintiff's] complaints, [Kalinski's] examinations of him and/or his chart, and the objective findings of the other health care providers who examined him." (Doc. No. 26 at 30). None of Kalinski's actions or decisions was taken for the purpose of causing harm to Plaintiff. Kalinski did not ignore Plaintiff's medical needs or deny him any necessary treatment for any alleged medical condition.

## II.     LEGAL STANDARDS

### (1)     Summary Judgment

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fec. R. Civ. P. 56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is material only if it might affect the outcome of the suit under governing law.  Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

As a general rule, when one party files a motion for summary judgment, the non-movant cannot merely rely on matters pleaded in the complaint, but must, by factual affidavit or the like, respond to the motion. Celotex, 477 U.S. at 324; Kipps v. Ewell, 538 F.2d 564, 566 (4th Cir. 1976); Fed. R. Civ. P. 56(e). However, a verified complaint, like the Amended Complaint that Plaintiff filed, is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge. Williams v. Griffin, 952 F.2d 820,

823 (4th Cir. 1991); <u>Davis v. Zahradnick</u>, 600 F.2d 458, 459–60 (4th Cir. 1979) (holding that the factual allegations contained in a verified complaint establish a prima facie case under 42 U.S.C. § 1983, so as to preclude summary judgment).

**(2)      Deliberate Indifference**

"[T]he Eighth Amendment's prohibition against 'cruel and unusual punishments' [extends] to the treatment of prisoners by prison officials" and "forbids the unnecessary and wanton infliction of pain," <u>Hill v. Crum</u>, 727 F.3d 312, 317 (4th Cir. 2013) (internal quotations omitted). "Prisoners alleging that they have been subjected to unconstitutional conditions of confinement must satisfy the Supreme Court's two-pronged test set forth in <u>Farmer v. Brennan,</u> [511 U.S. 825, 832 (1994)]." <u>Scinto v. Stansberry</u>, 841 F.3d 219, 225 (4th Cir. 2016). The plaintiff must show that he had serious medical needs, which is an objective inquiry, and that the defendant acted with deliberate indifference to those needs, which is a subjective inquiry. <u>See</u> <u>Iko v. Shreve</u>, 535 F.3d 225, 241 (4th Cir. 2008). In order to be sufficiently serious, the deprivation must pose "a serious or significant physical or emotional injury resulting from the challenged conditions," or "a substantial risk of such serious harm resulting from ... exposure to the challenged conditions." <u>De'lonta v. Angelone</u>, 330 F.3d 630, 634 (4th Cir. 2003) (internal quotation marks and citation omitted). To constitute deliberate indifferent to a serious medical need, "the treatment [a prisoner receives] must be so grossly incompetent, inadequate, or excessive to shock the conscience or to be intolerable to fundamental fairness." <u>Miltier v. Beorn</u>, 896 F.2d 848, 851 (4th Cir. 1990), *overruled on other grounds by* <u>Farmer</u>, 511 U.S. at 825. Where a deliberate indifference claim is predicated on a delay in medical care, there is no Eighth Amendment violation unless "the delay results in some substantial harm to the patient" such as "marked" exacerbation in his medical condition or "frequent complaints of severe pain." <u>Formica v. Aylor</u>, 739 Fed. Appx. 745, 755 (4th Cir. 2018)

(noting that Fourth Circuit unpublished opinions are not binding precedent but noting that the substantial harm standard is consistent with at least four other courts of appeals) (quoting <u>Webb v. Hamidullah</u>, 281 Fed. Appx. 159, 166-67) (4th Cir. 2008), citing <u>Sharpe v. S.C. Dep't of Corr.</u>, 621 Fed. Appx. 732, 734 (4th Cir. 2015)).

Mere negligence or malpractice does not violate the Eighth Amendment. <u>Miltier</u>, 896 F.2d at 852. Further, "mere '[d]isagreements between an inmate and a physician over the inmate's proper medical care' are not actionable absent exceptional circumstances." <u>Scinto</u>, 841 F.3d at 225 (quoting <u>Wright v. Collins</u>, 766 F.2d 841, 840 (4th Cir. 1985)).

**(3)**      <u>**Sovereign Immunity**</u>

The Eleventh Amendment bars suits directly against a state or its agencies, unless the state has waived its immunity or Congress has exercised its power under § 5 of the Fourteenth Amendment to override that immunity. <u>Will v. Michigan Dep't of State Police</u>, 491 U.S. 58, 66 (1989). Congress has not imposed § 1983 liability upon states, and the state of North Carolina has done nothing to waive its immunity. <u>Bright v. McClure</u>, 865 F.2d 623, 626 (4th Cir. 1989) (citing <u>McConnell v. Adams</u>, 829 F.2d 1319, 1328 (4th Cir. 1987)).

"[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity." <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985). Therefore, a lawsuit against an officer in his official capacity is, in substance, a claim against the governmental entity and should be subject to the same analysis. <u>See</u> <u>Almone v. City of Long Beach</u>, 478 F.3d 100, 106 (2d Cir. 2007); <u>see</u> <u>Hutto v. S.C. Retirement Sys.</u>, 773 F.3d 536, 549 (4th Cir. 2014) (State officials sued in their official capacities for retrospective money damages have the same sovereign immunity accorded to the State).

**(4)**      <u>**Qualified Immunity**</u>

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). The existence of qualified immunity "generally turns on the 'objective reasonableness' of the actions" without regard to the knowledge or subjective intent of the particular official. Am. Civil Libs. Union of Md., Inc. v. Wicomico County, Md., 999 F.2d 780, 784 (4th Cir. 1993) (quoting Anderson v. Creighton, 483 U.S. 635, 639, 641 (1987)) (internal citations omitted).

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims by determining whether: (1) the facts that a plaintiff has alleged or shown make out a violation of a constitutional right; and (2) the right at issue was "clearly established" at the time of defendant's alleged misconduct. While the sequence of the steps set forth in Saucier is "often appropriate," it is not mandatory. Pearson, 555 U.S. at 236. Judges are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. Id.

To overcome the qualified immunity defense at the summary judgment stage, the plaintiff must have shown facts that make out a violation of a constitutional right, and the right at issue must have been "clearly established" at the time of the defendant's alleged misconduct. Thompson v. Commonweath of Va., 878 F.3d 89, 97 (4th Cir. 2017) (citing Pearson, 555 U.S. at 232). The

analysis takes place against the backdrop of two dueling interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231.

To find a right is clearly established does not mean that "the exact conduct at issue [must] have been held unlawful for the law governing an officer's actions to be clearly established." Amaechi v. West, 237 F.3d 356, 362 (4th Cir. 2001). Rather, the court's analysis must take into consideration "not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." Id. at 362-63 (internal quotation omitted). The right at issue is "clearly established" for qualified immunity purposes if:

> [t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right. That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.

Anderson, 483 U.S. at 640 (citation omitted).

To determine if the right in question was clearly established, the court first looks to cases from the Supreme Court, the Fourth Circuit, or the highest court of the state in which the action arose. Owens ex rel. Owens v. Lott, 372 F.3d 267, 279 (4th Cir. 2004). In the absence of "directly on-point binding authority," courts may also consider whether "the right was clearly established based on general constitutional principles or a consensus of persuasive authority." Booker v. South Carolina Dep't of Corr., 855 F.3d 533, 543 (4th Cir. 2017); Owens, 372 F.3d at 279 ("the absence of controlling authority holding identical conduct unlawful does not guarantee qualified immunity."). Ordinarily, the unlawfulness of government conduct must be apparent in light of pre-

existing law. <u>White v. Pauly</u>, 137 S.Ct. 548, 442 (2017). However, a "general constitutional rule … may apply with obvious clarity ... even though the very action in question has not previously been held unlawful. <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002) (citing <u>United States v. Lanier</u>, 520 U.S. 259, 271 (1997)). Therefore, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." <u>Id.</u> at 741.

**(5)    Punitive Damages**

A jury may be permitted to assess punitive damages in a § 1983 action when the defendant's conduct is shown to be "motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others" <u>Smith v. Wade</u>, 461 U.S. 30, 51 (1983).

**III.    DISCUSSION**

Plaintiff allege that Defendant Kalinski knew about his painful and potentially dangerous sickle cell condition yet repeatedly delayed and denied treatment. He specifically alleges that Defendant Kalinski came to his cell in March 2016 after he declared a medical emergency and told him that nothing was wrong with him and denied him treatment. He further alleges that, after he returned from an outside hospital stay where he received a blood transfusion, Kalinski refused to refill his prescription when he ran out of medicine, did not schedule a meeting with Plaintiff, and that he consequently went without his medication for a month.

Defendant Kalinski has submitted an affidavit and medical records in support of her Motion for Summary Judgment. These materials demonstrate that Defendant Kalinski had limited contacts with Plaintiff, that he saw and received treatment from other providers, that she and other providers ordered pain relief medications on many occasions, that there was never a period when he was completely denied pain medication, that Kalinski became concerned that Plaintiff might be opiod-

dependent after several occasions when Plaintiff's examinations were not consistent with the symptoms he reported, and that Plaintiff failed to see Kalinski on several occasions, including for blood testing that is necessary for some prescription pain medications. Defendant Kalinski maintains that she provided Plaintiff with appropriate treatment based on the circumstances and her professional training and judgment each time she encountered Plaintiff and Plaintiff's chart, and that she never ignored him or failed to appropriately treat his complaints. Plaintiff has failed to come forward with any evidence refuting the foregoing. His claims thus appear to be based on disagreements with Kalinski's actions and, at most, negligence which fail to rise to the level of deliberate indifference. He has not demonstrated that a genuine dispute of material fact exists for trial, and therefore, Defendant Kalinski's Motion for Summary Judgment will be granted.

To the extent that Plaintiff attempts to seek damages against Defendant Kalinski in her official capacity, these claims are barred by sovereign immunity. Defendant Kalinski is entitled to qualified immunity on Plaintiff's claims against her in her individual capacity because he has failed to show that any constitutional violation occurred and she has presented evidence that her actions were reasonable under the circumstances. Nor has Plaintiff presented any evidence of evil intent such that punitive damages would be available. Further, Plaintiff's claims for injunctive relief are moot as he is no longer at a facility under Defendant Kalinski's care. See Williams v. Griffin, 952 F.2d 820 (4th Cir. 1991) (prisoner's transfer moots a § 1983 request for declaratory and injunctive relief when the conditions of which the prisoner claims are unlikely to recur). Therefore, Defendant Kalinski is entitled to summary judgment on these bases as well.

## IV. CONCLUSION

Based on the foregoing, Defendant Kalinski's Motion for Summary Judgment is granted and this case will be closed.

**IT IS, THEREFORE, ORDERED** that:

1. Defendant Kalinski's Motion for Summary Judgment, (Doc. No. 24), is **GRANTED**.

2. The Clerk is respectfully requested to mail a copy of this Order to Plaintiff at his address of record (Maury C.I.) as well as at the Neuse Correctional Institution, PO Box 2087, Goldsboro NC 27533-2087.

3. The Clerk is instructed to close this case.

Signed: January 23, 2020

Frank D. Whitney
Chief United States District Judge